The opinion of the Court was delivered by
WITHERS, J.
The leading question on the trial of this case, that indeed upon which the defendants staked the fate of their defence, was whether the four hundred and eighty-six bushels *275 of wheat and the one hundred and fifty barrels of flour, the subject-matter of contest, were consigned to them by one Williams upon an order for purchase; or whether these articles were sent to them as factors or consignees merely, and therefore subject to the order of the shipper. This question the jury determined against the defendants; and, in the opinion of this Court, there was abundant evidence to support such finding. In the first place, Williams drew a bill of exchange against the goods in favor of McPherson and accompanied the same by the carrier’s receipts placed in his hands but not otherwise transferred. The same receipts had been in the hands of one Morrow for a few days and were redeemed by McPherson, who reimbursed Morrow for his advancement to Williams, whereby the indebtedness of the latter to McPherson was increased. This disposition of the carrier’s receipts, accompanied by a draft, is not reconcilable to the idea that Neuffer & Hendrix were the owners of the wheat and flour; for it must have been intended from the very nature of the transaction, and the evidence is explicit that it was in fact intended, to give Morrow first and McPherson last some sort of control over the articles shipped, or over the specific proceeds of them, to secure the reimbursement of money advanced. In the second place — The account current with Williams, produced by Neuffer & Hendrix, which (they say) embraces the goods that are the subject of this action, debits the defendants with the nett proceeds of those goods which is wholly inconsistent with the pretension that they were purchased in pursuance of a contract for the same at stipulated prices. Jn the third place — In the letter of the 30th July from Williams to the defendants, wherein he says he will furnish five hundred barrels of flour at six dollars and fifty cents per barrel, and from three to ten thousand bushels of wheat at one dollar and fifty cents per bushel, he also says, as follows: “ I need no letters of credit where railroad receipts' accompany the drafts and therefore return them.” It is clear from this, *276 that Williams meant to pledge tbe articles shipped by the use of the carrier’s receipts, and not to rely upon bills drawn on his vendees in Charleston, nor to place the payees of those bills upon the credit of him and his consignees merely. He could not so pledge goods that had become another’s by sale and delivery. He m,eant to occupy such position as would preserve the right of stoppage in transitu. Lastly — When Rhett, in behalf of the plaintiff, called upon the defendants for an acceptance of the draft, or a renunciation of the consignment by an indorsement of the carrier’s receipts, whereby he would have been entitled to demand and receive the goods from the carrier, the claim of title to them by purchase, or the right to hold them on any other ground, was not pretended. We, therefore, consider the jury well warranted in affirming that Neuffer & Hendrix were not purchasers, in any sense.
Then, in the argument here, the defendants’ resort to the rights of consignee or factor, and assert a claim to retain for liens, to wit, for expenses, for balance on account, and liabilities for acceptances. This right, they allege, existed when a demand was made by Rhett, on the 28th August, 1855, and no reimbursement or release from liability was then, or afterwards made or tendered.
There is no occasion to discuss the fruitful topic of law as to such rights of factor or consignee, being creditor of the shipper upon advances made, expenses paid, or acceptances yet to mature. The general principle is clear enough in favor of such right to retain in such circumstances. But the question arises, was there in point of fact any lien on these goods ?
As to advances made or liabilities upon acceptances; there is no evidence of either, (unless it can be discovered in the account current,) on the 28th August, 1855, or at any other time, touching the specific wheat and flour in question. The wheat was not delivered to the railroad in Tennessee earlier *277 certainly than tbe 31st July, 1855, and tbe flour not earlier than tbe 15tb and 21st August, of tbe same year. Now tbe acceptances charged in tbe account with Williams are all before either of tbe above dates: they are of July 23d, July 24th, and August 3d, 1855, and make an aggregate of three thousand seven hundred and fifty-five dollars. When we observe, as the report states, that “from June to September large shipments of wheat and flour were made by Williams to the defendants, the sales of which were made by them ’till November,” — that Williams’ plan of business, as set forth in his letter of July 30th, and illustrated by what he actually did with McPherson, was to draw a bill against his shipments and supply the payee of the same with the carrier’s receipts— that there is no evidence and if the truth were otherwise the defendants would have shown it, that Williams drew any bill against the wheat and flour in question, except that delivered to McPherson and refused acceptance by the defendants, it cannot be believed or plausibly affirmed, that on the 28th August, 1855, they were under acceptance for Williams on account of these particular parcels of wheat and flour, or either of them. Such matters as are entered in their account, under two lumping items, under the general date of December 29th,'sold nobody knows when or when received, may or may not embrace the parcels now sued for, but the aggregate nett proceeds make the defendants debtors, not creditors. So the right to enforce any specific liens on the specific wheat and flour is not established, but rather disproved.
As to their right to retain for general balance on account against Williams — Where is the evidence that he owed them any general balance, at any particular time ? If the truth was so, could not the defendants have shown it ? What they do show, however, is this ; under date 29th December, 1855, they credit Williams with three thousand one hundred and fifty-one dollars and sixty-six cents, nett sales of flour and shorts, due September 10th preceding, and with one thous- *278 and six hundred and twenty-one dollars and sixty-three cents for nett sales of wheat, due September 24th preceding, amounting in the aggregate to four thousand seven hundred and seventy three dollars and twenty-nine cents. Deduct for acceptances charged by the defendants, and hereinbefore stated, three thousand seven hundred and fifty-five dollars, and the balance was in favor of Williams for one thousand and eighteen dollars and twenty-nine cents. Nor is this balance to be reduced by the item of one thousand dollars entered as for forfeiture paid to Bavenel & Co. Neither the payment of this item nor the authority and duty to pay it, on account of Williams, is proved. A book entry will not maintain such demand. Whether such sum was ever paid, or to whom, the defendants’ witness did not know. He said defendants paid to Bavenel & Co. a forfeiture upon default in supplying wheat according to their contract. In their account with that firm, however, we find charged on that score, under date 13th September, 1855, five hundred-and forty dollars and thirty cents, forfeiture on five thousand four hundred and three bushels of wheat, short delivery. The rate of forfeiture was therefore ten cents per bushel. What had W illiams to do with this ? The forfeiture charged to him as paid to Bavenel & Co., is represented to have accrued on a contract with them by Williams through the defendants, is set down at one thousand dollars, and under date 25th August, 1855. It is urged that this arose from Williams’ default to forward ten thousand bushels of wheat according to his contract, as shown by his letters, copies of which appear in the brief. There is not a particle of proof of such a contract between Williams and Bavenel & Co., and this item of forfeiture becomes too suspicious to warrant any complaint against a jury who should reject it, when the conflict of dates and sums above noticed,is taken into consideration. In one account a forfeiture for five hundred and forty dollars and thirty cents, is entered on 13th September; *279 in tbe other tbe forfeiture is entered for one thousand dollars as of 25th August. Conjectures are submitted to account for these discrepancies, but where a man is called upon to pay one thousand dollars on such a score as this, nothing less than explicit, intelligible and reliable proof will do. The lack of such evidence, on the part of those who make such demand, and the production of such evidence as we have here, combine to explode the item for forfeiture. Then, we conclude, there is no evidence that on the 28th August, when the plaintiff demanded an acceptance of his draft for one thousand five hundred dollars, or a transfer of the wheat and' flour, or what is tantamount, a relinquishment to him of a right to receive them, the defendants had any general balance against Williams on factorage account.
As to their lien at that time for expenses or commissions, or both — Whether the wheat had been then received, or if so, whether it had been sold, is left in uncertainty. Hendrix said, he did not know whether the flour had been received and he said no more. No claim so far as “the evidence goes, was then made to retain on any account whatever! How could payment be made of such a claim, or tender of it required, when such right was unclaimed and unknown? If a party have a lien and does not mention it as a ground of refusal, but refuses upon other grounds, it is evidence of his having waived the lien; Duke vs. Richards and note, 41 Eng. Com. L. R. 340.
Thus far the result is, that in the four hundred and eighty-six bushels of the. wheat, and one hundred and fifty barrels of flour, the defendants had no right of property, absolute or qualified, and ought to have rendered them to the rightful owner on the 28th August, 1855.
We are thus brought to the question, had McPherson then the right of property in the wheat and flour: if he had not there was at that time no conversion as against him.
Whatever equitable interest or lien he may have had by *280 tbe possession of tbe carrier’s receipts and tbe advancement of money to tbe shipper upon bis bill drawn against tbe goods, be bad not on tbe 28th August such legal title to them as would have then maintained an action of trover. This seems very plain when we observe, that on tbe 21st August, Williams being then tbe unquestionable owner of tbe goods, drew a bill against them upon tbe consignees for one thousand five hundred dollars and delivered that, with the carrier’s receipts, to tbe payee, the plaintiff. What then was expected and necessarily imported by such transaction? Undoubtedly that Neuffer & Hendrix would accept tbe bill and sell tbe goods to pay it. If tbe goods themselves were sold tbe receipts might as well have been then indorsed as on tbe 3d September afterwards. While goods are in transitu it is often very difficult to say, as whose agent tbe carrier bolds them, when a transfer of some right of property in them, or some kind of possession of them, actual or constructive, is meant to be transferred by tbe original bailor to a third person: and this presents the arena of vast litigation. Every such case must rest as well upon intention as upon acts done. We think tbe facts show that Williams never parted with tbe legal right to the goods, tbe right of stoppage in transitu, either to Morrow or to McPherson, and that he never so intended until the 3d September, when he assigned the receipts. Then it was that McPherson acquired such legal interest as would maintain trover, against a wrong doer. He did not before acquire it, else the bill of exchange to be accepted, and paid by tbe defendants out of tbe sales of the goods, would never have been drawn. This consideration overthrows the idea that the mere delivery of the carrier’s receipts not indorsed or assigned, was a symbolical delivery of the goods themselves, as in tbe case of the key of a warehouse, or the transfer of a bill of lading within the law commercial. In the case of Wilhes et al. vs .Ferris, 5 Johns. 336, cited for the plaintiff, tbe sugar there in question had itself been assigned, and the *281 warehouseman’s receipt delivered by the assignor, and this makes an obvious distinction between that case and this. The defendants were expected to accept the bill of exchange, and it could not have been designed that they should, when the receipts unassigned were delivered, part with the goods, This seems to have been understood by McPherson and Williams, for measures were at once taken to procure assignments of the receipts. It is not perceived how McPherson could have compelled a delivery of the wheat and flour to him, by the railroad or other person, before he acquired the right so to do on the 3d September, 1855.
Nevertheless we think that McPherson’s action was well founded when he did institute it. What occurred on the 28th August, though no conversion as against him, was full notice to the defendants of his claim and 'of a revocation of their authority to receive the goods or to dispose of them, proceeding from Williams who was the owner confessedly.
The plaintiff brought his action in October, he acquired his legal right on the 3d September, meantime, or at some uncertain time which the defendants chose to leave uncertain, they sold the goods, and certainly that act was a conversion itself. If a party wrongfully assume property in' goods belonging to another, or wrongfully use them, it amounts to a direct conversion, and in general no demand or refusal is necessary before bringing an action, nor is it necessary to offer to pay any charges. 6 East, 540. Brown on Actions at Law, 437, and the authorities cited in note. It was indeed contended that the wheat was received and. perhaps sold before the 28th August, and before McPherson’s title was perfected. If this be true, (and the defendants having it in their power failed to prove it,) what more natural, what more incumbent on them, than to have said so to Ehett, and to have placed their refusal to accept the draft, or to transfer or deliver the goods, on such grounds ? Yet the defendants did not, and in the account current produced by them they do not, *282 disclose tbe time of sale, nor identify one parcel of wheat or flour as distinguished from another, nor adduce any evidence on these points. If they thus withhold what it must be presumed was in their power to disclose, they cannot justly complain that adverse inferences have been drawn from imperfect and dubious disclosures, some of which, as the item of forfeiture for example, excites distrust.
We have not in this discussion been guided by the order observed in the series of grounds of appeal, nor have we altogether restrained our investigation to limits plainly prescribed by them. The grounds of appeal taken ought to limit the discussion in this Court. It was desirable however to give them in the present instance, a liberal scope, rather than incur the hazard of too narrow a view of the real merits of this cause. The observations already made comprise a consideration of the meritorious questions which the evidence makes, and grounds of appeal taken could make no more. If certain questions were not made upon the circuit, or little attended to there, that are stirred here, or if a better foundation could have been laid there for the defendants, in certain respects, by the production of more testimony than they did adduce, and they have suffered from obscurities thence arising, the consequences must justly rest upon themselves.
The motion is dismissed.
Wardlaw, WhitNEb, G-lovek and Mustro, JJ., concurred.

Motion dismissed.